## WOODRUFF *v.* COOK and others.

Error of judgment by a surrogate, however palpable, does not render proceedings under it void; and advantage can only be had on appeal. It cannot be passed upon in a collateral suit or action.

A mother's charge for maintaining children after a father's death is not to be construed into a debt which can allow a surrogate to sell the real estate of the latter.

Where a title is impeached, a purchaser should fully, positively and precisely aver in pleading the absence or want of notice of fraud or trust, even though it be not charged in the bill; as well as all knowledge of facts charged and from whence notice may be inferred.

If a party defendant rely upon the want of notice in another from whom he purchased, he must aver the fact in pleading.

M. W. died intestate, leaving real estate mortgaged, and also a widow and two children. The widow administered; and under a claim of her own for maintenance and the mortgage debt of her husband and through the interference of her brother, she got a surrogate's order to sell the real estate, which was bought in by her father: and he, soon after, conveyed it back to her, apparently for about double consideration. No money passed. Under a *fi. fa.* against the widow individually, her right in the real estate was sold by a sheriff and bought and conveyed to C., who devised it to his wife, and died. Upon a bill filed by one of the children of M. W.: *Held,* that the deeds between the widow of M. W. and her father were fraudulent; and that as notice of fraud or trust was not averred, C's deed was void. Also, that the children were entitled to the extent of their original right; that the parties defendants, according to the times of possession, were to account for rents and profits; that the dower right of M. W's. widow passed to C. under the sheriff's deed; and that as C's widow had paid off the mortgage which had been given by M. W., she was to be allowed it in account.

Morris Woodruff died in the year one thousand eight hundred and seven, seized of the premises now in controversy, consisting of a lot of land, with buildings thereon, situated in Brooklyn. He left a widow and also two children, namely, the complainant and Thomas M. Woodruff, who was a party defendant; and both of whom, at the time of their father's death, were infants. The eldest was about three years of age. The property descended to them as heirs at law, subject to the right of dower of their mother Susannah W. Woodruff, who was likewise nominally a party defendant to this suit. She had taken out letters of administration: and afterwards, in the month of January, one thousand eight hundred and twelve, through the agency of one Henry

*Feb. 25th,*
*1834.*

*Fraudulent*
*sale and con-*
*veyance.*
*Administra-*
*tor.*
*Notice.*
*Pleading.*

W. Eaton, her brother, caused a petition to be presented to William Livingston, Esquire, then Surrogate of King's County, praying an order of sale of the real estate, on the ground that the personal property was insufficient to discharge the debts. Upon the petition, proceedings were had before the surrogate, which resulted in an order, made on the ninth day of March one thousand eight hundred and twelve, directing a sale by the administratrix of all the real estate. By virtue of this authority, the property in question was advertised, put up at auction and struck off to Thomas Eaton, her father ; and on or about the first day of April, one thousand eight hundred and twelve, she executed a deed to him as the purchaser. It purported to be for the consideration of one thousand five hundred and fifty dollars (the price at which it was sold). This deed contained a recital of the order of the surrogate, as the authority for making the sale, with a covenant of warrantee as to the title. Immediately on receiving this deed, Thomas Eaton, by another conveyance, bearing date the second day of April one thousand eight hundred and twelve, apparently for the consideration of three thousand dollars, conveyed the same property back to her absolutely in fee, with full covenants as to the title. Afterwards, in the latter part of the year one thousand eight hundred and thirteen, and in one thousand eight hundred and fourteen, a number of judgments at law were recovered against Susannah W. Woodruff in her private capacity ; and upon which writs of fieri facias were issued to the sheriff of King's County. As the legal title to the property in question stood in her name , the sheriff levied upon it, and, by virtue of the executions, advertised and sold her estate, right, title and interest therein. William Cook became the purchaser, at the sum of seven hundred dollars, and paid that amount to the sheriff and received the sheriff's deed in the usual form of such conveyances bearing date the nineteenth of July, one thousand eight hundred and fifteen, duly executed. Under it, Cook entered into possession. At his death the possession devolved upon his widow Rebecca Cook, to whom he devised it for life, and who had ever since held the property under the title acquired at the sheriff's sale.

The object of the bill in this cause, was to set aside the

sale of the property effected by virtue of the proceedings before the surrogate, as being merely colourable and fraudulent in respect to the complainant and his brother; and as being irregular and insufficient, upon the face of such proceedings, to pass any title to a purchaser; and, likewise, to have the deed from the sheriff to William Cook declared void and of no effect as against the complainant, and so that the defendants Rebecca Cook and others, the representatives of William Cook, might be decreed to release to the complainant his share of the property, and they, together with Susannah W. Woodruff, might account for the rents and profits since the death of Morris Woodruff.

*1834.*

*WOODRUFF*
*v.*
*COOK.*

Mr. *O. Bushnell,* for the complainant.

Mr. *Bogardus,* for the defendants.

THE VICE-CHANCELLOR:—As the legal title and estate were in the complainant and his brother at the death of their father, the first question is, whether they were divested of it by the proceedings before the surrogate and the sale which took place thereupon?

*Oct. 6th.*

There appears to have been enough presented to the surrogate, in the first instance, to give him jurisdiction. He had before him a petition, in due form, suggesting a deficiency of assets and an account annexed containing items of personal estate and debts; and the truth or falsehood of the account was immaterial as regarded the question of jurisdiction. It is true, the account upon its face appears a very extraordinary one for the purpose of laying a foundation for such a proceeding; and it shows that the surrogate in deciding, as he did, upon the propriety of a sale, was either grossly ignorant of the intention and object of the statute and of his duty under it or entirely regardless of the rights and interests of the infants. But, in the exercise of his powers, having acquired jurisdiction, he must be considered as acting judicially; and an error of judgment, however palpable, does not render the proceedings void but voidable and advantage can only be taken of the error on an appeal and not in

any collateral suit or action where the proceedings may come in question. In *Jackson* v. *Robinson*, 4 Wend. 436. and in the still more recent case of *Jackson* v. *Irwin*, 10. Wend. 441., the effect of similar proceedings before surrogates to pass the title of real estate was considered by the Supreme Court and the principles which govern on this subject are there very clearly stated.

Although the order of sale in this case may not be deemed a nullity, yet the conduct of the parties as exemplified throughout the proceeding, and especially in relation to the sale of the property to Thomas Eaton and his immediate conveyance of it back to the widow, without any money being paid (for none was ever paid to the surrogate as his subsequent order shows, although the order of sale directed the purchase money to be brought in for distribution according to the statute) all tend to prove there was a preconcerted design, on the part of the widow and her father and brother, to change the title of the property by divesting the children of it and vesting the same in her, the better to enable her to raise money by mortgage or otherwise for their private purposes. All this is evident from the circumstances and proofs in the cause, independently of the testimony of the widow given upon her examination as a witness—but which, I think, is inadmissible as against the defendants.

As respects the children, the sale was manifestly a fraudulent one ; and if the question were now between them and their mother as to whether she could hold the property as her own under the title thus acquired, there can be no doubt it would be the duty of this court to compel her to restore it to them.

Had the sale been regularly conducted under the surrogate's order and some third person had become the purchaser in good faith, the abuse of the law or fraud upon the rights of the children to which I have adverted might not be permitted to defeat the title of such purchaser. But in the present case, Thomas Eaton was not a *bona fide* purchaser. The property was struck off to him and a deed executed merely that he might convey to her. He was an instrument only. No money passed. Indeed, there appears to have been no occasion for any. According to the subsequent

proceedings and entries in the surrogate's office, the credi-
tors were called upon by public notice to produce their de-
mands before him and no one appeared, and he then found
that all the debts of the intestate Morris Woodruff "had
been settled and adjusted by the administratrix." In the ac-
count of debts exhibited at the inception of the proceeding,
the chief items to show that " the aid of the surrogate in the
premises was required" was one of three hundred dollars due
on a mortgage to a person named Bonton ; and this mortgage
was not paid out of the pretended proceeds of sale, but re-
mained a subsisting incumbrance when Cook purchased at a
sheriff's sale and was afterwards paid out of the estate or
by him. The other was a charge of one thousand four hun-
dred and seventy-five dollars due to the mother herself for
the maintenance of the two children, at three hundred dol-
lars per annum, since the death of their father; and as this
sum was claimed by her as a creditor, it required no money
to be actually paid down upon his becoming the purchaser
of the property which he was immediately to transfer to her.
The conclusion is a safe one that no money was paid ; and
that the sums specified in the deeds were merely nominal.
In the second deed, the amount is nearly double the first, as
if she had allowed and paid her father an immediate profit
of nearly one hundred per cent. The circumstances forbid
our believing it ; and it is manifest that the object of the par-
ties was not to convert the property into money by a real
sale for the payment of debts against the intestate's estate,
but to change the title upon paper and, under the forms of
law, to give it the semblance of an actual transfer. Even if
the mother's demand against her children for maintenance
was a just one, it was not a debt or claim against the estate
for which the property was liable to be sold in this manner :
and yet the surrogate must have proceeded upon the mista-
ken ground that the statute did authorize a sale for the pay-
ment of such demands as well as for the satisfaction of debts
contracted by the ancestor himself.

Under these circumstances, it is impossible Mrs. Wood-
ruff can be considered a purchaser with a valid title as
against her children. Even supposing the sale to have been
duly authorized and no fraud really intended, still public

*1834.*

WOODRUFF
*v.*
COOK.

policy requires that no person standing in her situation with respect to the sale of property and the rights of others should be permitted to become a purchaser at such a sale either directly or indirectly ; and upon this ground alone the conveyance to her would be avoided and she would be treated as a trustee holding the property for the benefit of her children and to the extent of their original rights. It is unnecessary to cite authorities in support of this familiar and well established doctrine ; but *Davoe* v. *Fanning*, 2. J. C. R. 252. and *Gallatian* v. *Erwin*, Hopk. R. 48. and in Error, 8. Cow. 361. may be mentioned as prominent cases where it has been applied.

The title in Mrs. Woodruff being thus defective, the next question is : what is the operation of this defect upon the title acquired by William Cook and of those claiming under him? Their title, if supported at all, must stand upon the ground of his being a *bona fide* purchaser for a valuable consideration and without notice of the fraud or trust affecting the title previously. It is only on this ground the defence can rest where a title is thus impeached. For the purpose of enabling them successfully to make this defence, they should aver in pleading the absence or want of notice of the fraud or trust, and this, too, fully, positively and precisely— even though it be not charged in the bill. They should also deny all knowledge of facts which are charged and from whence notice may be inferred. All this is necessary in order that the facts constituting the defence may be put in issue and proved ; and the rule likewise is, that if the party rely upon the want of notice in another from whom he purchased, he, still, must aver the fact in pleading : *Gallatain* v. *Erwin*, supra, and cases there cited. Now, the answer of the defendants does not contain the requisite averments to make out their defence. They do not appear to put themselves upon the ground that William Cook was such *bona fide* purchaser without notice : but rely upon the regularity of the proceedings before the Surrogate, with the fairness of the sale to Thomas Eaton and his conveyance to Mrs. Woodruff, and also the good faith of all those parties in the transaction as giving validity to the title in her. This, however, proves defective ; and if William Cook purchased upon

the strength of it, without any thing more, he must be deem-
ed to have taken upon himself the risk of its being set aside.
On the other hand, if he bought in entire ignorance of the
manner in which she acquired title and paid his money inno-
cently and upon the faith of an absolute ownership in her—
she being in possession and a deed standing in her name—
without any act or circumstance coming to his knowledge
to create suspicion or to induce an inquiry whether her chil-
dren were not interested, then, in order to protect his pur-
chase and enable them to hold the property upon the ground
of a superior equity, the defendants should have averred in
their answer particularly a want of notice and every fact
necessary to raise that equity in their favor. As the case
now stands, they cannot claim the benefit of the protection
which the law affords to *bona fide* purchasers without no-
tice; and even if their answer had contained such aver-
ments, still it appears to me, from the nature of the case and
under the circumstances, that it would have been very diffi-
cult to support their title against the complainant.

I must decree in his favor to the extent of his original
right. The property descended to him and his brother in
equal moieties as tenants in common, subject to the right of
dower in their mother and to the Bouton mortgage given
by their late father.

The complainant is, therefore, entitled to an account of
one third of the rents and profits—his mother's dower tak-
ing off one third, while his brother is entitled to the remain-
ing third—and his share of the property is chargeable with
one half of the principal sum and interest payable on the
Bouton mortgage. An account of the complainant's share
of the rents and profits must be taken against the executors
of William Cook from the time of his purchase to the period
of his death ; and from that event it must be continued against
his widow Rebecca Cook, to whom the whole income of the
estate was devised by her husband for life and who has, since
his death, been in possession. As Mrs. Cook has paid off
the Bouton mortgage, she is entitled to stand in the place of
the mortgagee and to have all proper allowances on this
score; and the executors of William Cook are to be allow-
ed for all monies paid by their testator in keeping down the

interest on this mortgage during his life—one half of which is chargeable to the complainants' share of the rents—and all proper allowances must likewise be made to them for taxes and repairs of the premises, as well as other incidental expenses.

The right of dower of Mrs. Woodruff in the premises continues during her life; and I think it is fair to say, her right passed by the sheriff's sale to William Cook. It was a sale and transfer of all her right, title and interest in the property; and, by reason of her personal covenants in the deed to Thomas Eaton her father, I think she is estopped from setting up or claiming her dower; while, William Cook having come into possession under a title which proceeded from her, may well be considered in equity possessed of her life interest as tenant in dower. When this ceases, the right and interest of the defendant Rebecca Cook and of her children as devisees in remainder will also end.

As to the mortgage given by Mrs. Woodruff to Phebe Lott before the sheriff's sale and while she pretended to be the sole owner of the property and which is understood to be a mortgage in fee:—no decree can now be made affecting its validity. It remains unpaid. The mortgagee is not before the court; and *non constat* that it can be avoided or that the complainant will attempt to set it aside. Until it is impeached, the court must regard it as a good mortgage. The purchase by Cook was subject to it; and so far as he or his representatives have paid interest, I am of opinion they must be allowed such payments out of the rents for which they are to account—charging one third to the complainant and bearing one third themselves as applicable to the dower (Mrs. Woodruff having created this incumbrance herself and embraced in it whatever interest or title she had.)

These requisites for taking the accounts must be contained in the decree; and all further directions, with the question of costs, are reserved.